IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**UNITED STATES OF AMERICA**

vs.                                                              **CRIMINAL ACTION No.: 3:17-CR-90-HTW-FKB**

**KAHARI SCOTT**

### ORDER

BEFORE THIS COURT is the defendant's Motion for Compassionate Release **[Docket no. 27]**. Defendant, by his motion, asks this court to reduce his sentence, or to order the United States Bureau of Prisons to allow him to serve the remainder of his sentence on home detention. The United States of America opposes such motion, saying that defendant has failed to exhaust his administrative remedies, failed to meet his burden of proof, and that this court does not have the jurisdiction to order home detention. This court has reviewed the submissions of the parties and finds as follows.

**I. FACTUAL BASIS**

On July 25, 2017, defendant Kahari Scott (hereinafter referred to as "Scott") was indicted as a felon in possession of a firearm in violation of Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Thereafter, Scott pled guilty on September 19, 2017. On January 12, 2018, this court sentenced him to the custody of the United States Bureau of Prisons (hereinafter referred to as "BOP") to be imprisoned for a term of 64 months.

Scott is currently serving his federal sentence at Forrest City Federal Correctional Institution's Low security section (hereinafter referred to as "Forrest City FCI") located in Forrest City, Arkansas. He is scheduled to be released on March 18, 2024. As of September 8, 2020, BOP

1

reported that Forrest City FCI had no confirmed COVID-19 cases out of a total population of 1,470 inmates.

Kahari, now a twenty-eight (28) year old African-American male, contends that he filed his request for compassionate release with the Warden of Forrest City FCI on April 2, 2020. The Warden of Forrest City FCI has not responded to Kahari's request for compassionate release.

The government contests whether Kahari has exhausted his administrative remedies before filing his motion for compassionate release.

BOP and the COVID-19 Pandemic

COVID-19, an extremely contagious illness, has caused many deaths in the United States in a short period of time and has resulted in massive disruption to the American society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (3/19/2020). BOP has had a Pandemic Influenza Plan in place since 2012. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January, 2020. At that time, BOP established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control. BOP also reviewed guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan (hereinafter referred to as "Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current, modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least fourteen (14) days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP further has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step, as well, will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of fourteen (14) days, or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19, or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or

higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended, absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

BOP stopped social and legal visits on March 13, 2020, and those visits remain suspended, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2)[1], and to

---

[1] (c) Prerelease custody.—[…]
    (2) Home confinement authority.--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

18 U.S.C.A. § 3624 (West)

move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g)[2].

---

[2] (g) Elderly and family reunification for certain nonviolent offenders pilot program

    (1) Program authorized

        (A) In general

            The Attorney General shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

        (B) Placement in home detention

            In carrying out a pilot program as described in subparagraph (A), the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention, upon written request from either the Bureau of Prisons or an eligible elderly offender or eligible terminally ill offender.

        (C) Waiver

            The Attorney General is authorized to waive the requirements of section 3624 of Title 18 as necessary to provide for the release of some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention for the purposes of the pilot program under this subsection.

    (2) Violation of terms of home detention

        A violation by an eligible elderly offender or eligible terminally ill offender of the terms of home detention (including the commission of another Federal, State, or local crime) shall result in the removal of that offender from home detention and the return of that offender to the designated Bureau of Prisons institution in which that offender was imprisoned immediately before placement on home detention under paragraph (1), or to another appropriate Bureau of Prisons institution, as determined by the Bureau of Prisons.

    (3) Scope of pilot program

        A pilot program under paragraph (1) shall be conducted through Bureau of Prisons facilities designated by the Attorney General as appropriate for the pilot program and shall be carried out during fiscal years 2019 through 2023.

    (4) Implementation and evaluation

        The Attorney General shall monitor and evaluate each eligible elderly offender or eligible terminally ill offender placed on home detention under this section, and shall report to Congress concerning the experience with the program at the end of the period described in paragraph (3). The Administrative Office of the United States Courts and the United States probation offices shall provide such assistance and carry out such functions as the Attorney General may request in monitoring, supervising, providing services to, and evaluating eligible elderly offenders and eligible terminally ill offenders released to home detention under this section.

    (5) Definitions

        In this section:

            (A) Eligible elderly offender

                The term "eligible elderly offender" means an offender in the custody of the Bureau of Prisons--

                (i) who is not less than 60 years of age;

                (ii) who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18), sex offense (as defined in section 20911(5) of


Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to

---

> this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;
>
> (iii) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii);
>
> (iv) who has not been determined by the Bureau of Prisons, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause (ii);
>
> (v) who has not escaped, or attempted to escape, from a Bureau of Prisons institution;
>
> (vi) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and
>
> (vii) who has been determined by the Bureau of Prisons to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.
>
> (B) Home detention
>
> The term "home detention" has the same meaning given the term in the Federal Sentencing Guidelines as of April 9, 2008, and includes detention in a nursing home or other residential long-term care facility.
>
> (C) Term of imprisonment
>
> The term "term of imprisonment" includes multiple terms of imprisonment ordered to run consecutively or concurrently, which shall be treated as a single, aggregate term of imprisonment for purposes of this section.
>
> (D) Eligible terminally ill offender
>
> The term "eligible terminally ill offender" means an offender in the custody of the Bureau of Prisons who--
>
> (i) is serving a term of imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16(a) of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18;
>
> (ii) satisfies the criteria specified in clauses (iii) through (vii) of subparagraph (A); and
>
> (iii) has been determined by a medical doctor approved by the Bureau of Prisons to be--
>
>> (I) in need of care at a nursing home, intermediate care facility, or assisted living facility, as those terms are defined in section 1715w of Title 12; or
>>
>> (II) diagnosed with a terminal illness.
>
> 34 U.S.C.A. § 60541 (West)

place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of August 7, 2020, BOP has transferred 7,378 inmates to home confinement.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates, while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

## II. ANALYSIS

Scott filed his motion, citing Title 18 U.S.C. § 3582(c)(1)(A) for authority. Section 3582, commonly referred to as the First Step Act, provides:

> (c) Modification of an imposed term of imprisonment.--The court may not modify a term of imprisonment once it has been imposed except that--
>
> > (1) in any case—
> >
> > > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
> > >
> > > > (i) extraordinary and compelling reasons warrant such a reduction; or
> > > >
> > > > (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which

>> the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>>
>>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and
>
> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; […]

18 U.S.C.A. § 3582 (West).

    a. *Exhaustion of Administrative Remedy*

The government contests whether Scott has exhausted his administrative remedies as to his Motion for Compassionate Release **[Docket no. 27]**. According to the government, Scott's Inmate Request to Staff form does not contain a date it was sent, nor a signature from the staff of the correctional facility. The government further states that the Warden's secretary and the Reduction in Sentence Coordinator both state that they never received such a form from Scott.

Scott replies that he had submitted his request to staff on April 2, 2020, requesting compassionate release due to his asthma and the COVID-19 pandemic. Moreover, says defendant, the counselor and his unit manager received the form on June 18, 2020, and Warden DeWayne Hendrix denied his request on June 30, 2020.

Scott filed his Motion for Compassionate Release **[Docket no. 27]** on June 5, 2020.

Scott filed his first request for compassionate release on April 2, 2020, two (2) months before he filed his motion in this court. It appears to this court's eye that Scott's April 2, 2020 request for compassionate release got lost in the shuffle of the correctional facility's administrative processes. That is not to say that the administration is lax in its duties, but the extraordinary circumstances presented by the COVID-19 pandemic and its particularized impact on correctional facilities led to the error. Accordingly, this court finds that Scott has complied with the mandates

of the First Step Act and that his Motion for Compassionate Release **[Docket no. 27]** is properly before this court.

    b.  *Burden of Proof*

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

To establish that defendant should be afforded compassionate release, the defendant must show that "extraordinary and compelling circumstances exist". The United States Congress further defined its intent in Title 28 U.S.C. § 994(t) which provides:

> The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

For further guidance, the Sentencing Guidelines policy statement at § 1B1.13 provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Scott argues that the categories of health conditions listed in the Sentencing Commission's policy statement "do not capture all extraordinary and compelling circumstances," and that the policy statement "indicate[s] that medical conditions, alone or in conjunction with other factors, can constitute extraordinary and compelling reasons" for compassionate release. *United States v. Beck*, No. 1:13-cr-186-6-CCE, 2019 WL 2716506, *8 (M.D.N.C. June 28, 2019). Scott further argues that a court is "not required to find that all of the criteria in [Comment] Note 1 are met in

10

order to grant" compassionate release on the basis of a medical condition. *United States v. Dimasi* 220 F. Supp. 3d 173, 193 (D. Mass. 2016).

Scott lists asthma as the medical condition that places him at risk for contracting COVID-19. Scott utterly fails to establish how asthma is either: (a) a terminal illness with an end of life trajectory; or (b) substantially diminishes his ability to provide self-care within the environment of the correctional facility and that he is not expected to recover. This court does not find that Scott has presented evidence that he suffers a terminal illness with an end of life trajectory. Similarly, this court does not find that Scott's ability to provide self-care while in the custody of BOP is diminished and that he is not expected to recover.

Scott also says that "the coronavirus has created a[n] 'extraordinary and compelling reason' that warrants a reduction of his sentence." This court is not persuaded. As United S tates District Court Judge Keith Starett said:

> "Preexisting medical conditions that place a defendant at increased risk for serious illness from COVID-19 are not in and of themselves sufficient to establish" grounds for compassionate release. *United States v. McLin*, 2020 WL 3803919, at *3 (S.D. Miss. July 7, 2020). Likewise, "general concerns about possible exposure to COVID-19" are not sufficient. *United States v. Takewell*, 2020 WL 404360 at *4 (W.D. Louisiana July 17, 2020). "[T]he mere existence of COVID-19 in society" and, consequently, the prison system "cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020) (citing BOP's COVID-19 Action Plan).

*United States v. Williams*, No. 2:16-CR-10-KS-MTP, 2020 WL 4210476, at *3 (S.D. Miss. July 22, 2020).

This court is required to follow 5th Circuit precedent. *See Guillot v. Unum Provident Corp*, No. 05-0858, 2006 U.S. Dist. LEXIS 94734, at *12 (W.D. La. Nov. 21, 2006). A generalized fear of contracting COVID-19 does not justify compassionate release. *United States v. Brown*, No. 3:18-cr-29-DCB-LRA, 2020 U.S. Dist. LEXIS 109625, at *5 (S.D. Miss. June 23, 2020) (Citing

11

*United States v. Williams*, No. 3:19-00239-01, 2020 U.S. Dist. LEXIS 99374, 2020 WL 3037075, at * (W.D. La. Jun. 5, 2020); *United States v. Veras*, No. 3:19-cr-010, 2020 U.S. Dist. LEXIS 59748, 2020 WL 1675975, at * 6 (M.D. Pa. Apr. 6, 2020); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 U.S. Dist. LEXIS 59439, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020)).

As of August 9, 2021, the BOP held 130,449 inmates. BOP already had instituted its own program to address COVID-19 concerns and its effects on the inmate population. For this court to find that COVID presents such an overwhelming circumstance, standing on its own, would defy logic and potentially allow all the inmates currently held in BOP facilities to be returned to the free world. Accordingly, this court does not find that the mere existence of the COVID-19 pandemic, without finding the remaining factors listed in the statute, mandates or allows a compassionate release.

c. *Danger to the Community*

Even if this court were to find that Scott had presented extraordinary and compelling reasons to grant compassionate release, he still has not demonstrated that he "is not a danger to the safety of any other person or to the community, as provided in Title 18 U.S.C. § 3142(g)." U.S.S.G.

§ 1B1.13(2)[3]. Title 18 U.S.C. § 3142(g)[4] requires this court to consider factors such as the nature and circumstances of the charged offense, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community at large that would be posed by the defendant's release.

Scott's instant offense of conviction, felon in possession of a firearm in violation of Title 18 U.S.C. § 922(g)(1), is not a crime of violence. This court notes that six (6) months prior to his arrest on the instant offense, on April 6, 2016, Scott was arrested for possession of a Taurus 9mm

---

[3] Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that--

    (1)(A) Extraordinary and compelling reasons warrant the reduction; or

        (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

    (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

    (3) The reduction is consistent with this policy statement.

U.S.S.G. 1B1.13

[4] (g) Factors to be considered.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--

    (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

    (2) the weight of the evidence against the person;

    (3) the history and characteristics of the person, including--

        (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

        (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

    (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C.A. § 3142 (West)

semi-automatic handgun, and he also possessed a 50-round drum clip. Next, on September 21, 2016, Scott fled on foot from an encounter with law enforcement. Then, on September 23, 2016, when he was arrested for the instant offense, he possessed another firearm. Later, on March 3, 2017, law enforcement officers executed a search warrant on Scott's grandmother. During that search, law enforcement officers found yet another 9mm pistol along with various narcotics: 8 g of marijuana; 452 dosage units of Xanax; 223 dosage units of ecstasy; and 8.56 grams of methamphetamine.

Scott's current conviction, however, was not his first felony offense. Scott, who is currently 27 years of age, has accumulated an ambitious criminal career: possession of marijuana (two convictions); possession of a stolen firearm (one conviction); possession of a firearm (three pending charges); shooting into an occupied vehicle (*nolle prosse* due to lack of credible witness); aggravated assault (*nolle prosse* due to lack of credible witness); and drive-by shooting (*nolle prosse* due to lack of credible witness). When this court sentenced Scott for the instant offenses, it found that Scott's criminal history category was III – a striking criminal history.

Scott has also admitted to being a member of the Gangster Disciples, the Hoover Gang, and the BM3 gang. Scott became a street gang member at the age of 14 and held the rank of OBG or Original Baby Gangster.

Scott contends that because he is being housed in a low security facility that the BOP does not consider him a dangerous individual and that he does not have any history of crimes of violence.

To this court's mind, Scott has demonstrated that he is a danger to the community because: (1) the nature and circumstances of his current offense of conviction and criminal history: that when no matter how many times he is arrested, he seeks and possesses firearms; (2) the weight of

the evidence—his guilty plea; (3) his history and characteristics to include his past assaultive conduct; his criminal history; and (4) the nature and seriousness of the danger he poses to the community through repeated firearm related offenses. *See* 18 U.S.C. § 3142(g). His current sentence of 64 months reflects Scott's public safety risk. Accordingly, this court finds that, even if Scott had presented an "'extraordinary and compelling reason' that warrants a reduction of his sentence," (a finding this court expressly chooses not to make) Scott also unmistakably presents a danger to the community if this court were to champion his release.

  d. *Home Detention*

Scott alternatively requests that this court order BOP to place Scott on home confinement to serve the remainder of his sentence. Once a sentence is imposed, BOP is clearly solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b)[5]; *Moore*

---

[5] (b) Place of imprisonment. The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—

  (1) the resources of the facility contemplated;
  (2) the nature and circumstances of the offense;
  (3) the history and characteristics of the prisoner;
  (4) any statement by the court that imposed the sentence—
    (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
    (B) recommending a type of penal or correctional facility as appropriate; and
  (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term

*v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *See United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). This court agrees.

### III. CONCLUSION

**IT IS, THEREFORE, ORDERED that Scott's Motion for Compassionate Release [Docket no. 27] is hereby DENIED for the reasons stated above.**

**SO ORDERED this the 16th day of August, 2021.**

**s/ HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**

---

of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.
18 USCS § 3621